**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TUBBY'S #14, LTD., et al,

        Plaintiffs,

v.

TUBBY'S SUB SHOPS, INC., et al,

        Defendants,

_____ /

CASE NO.  04-70918

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

## OPINION AND ORDER
## (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS, MOTION FOR SUMMARY JUDGMENT, AND MOTION TO EXTEND TIME (DKT. #37);
## (2) DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY PURSUANT TO COUNT VI OF THE AMENDED COMPLAINT (DKT. #56); AND
## (3) DENYING DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT ON COUNT VI (DKT. #58)

Now before the Court are three motions: (1) Defendants' Motion to Dismiss, Motion for Summary Judgment, and Motion to Extend Time; (2) Plaintiffs' Motion for Partial Summary Judgment as to Liability Pursuant to Count VI of the Amended Complaint; and (3) Defendants' Second Motion for Summary Judgment on Count VI.  Having considered the entire record, including arguments set forth at a motion hearing, and for the reasons that follow, the Court:

    (1)    GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss, for Summary Judgment, and to Extend time;

    (2)    DENIES Plaintiffs' Motion for Partial Summary Judgment as to Liability Pursuant to Count VI of the Amended Complaint; and

    (3)    DENIES Defendants' Second Motion for Summary Judgment on Count VI.

1

## I.   FACTS

Plaintiffs filed an eighteen count Original Complaint on March 11, 2004 against

Defendants Tubby's Sub Shop ("Tubby's"), SUBperior Distribution Services, Inc. ("SDS"),

SubLine Company ("SubLine"), Tubby's Sub Shops Advertising, Inc. (Tubby's Advertising"),

Robert M. Paganes, Peter T. Paganes and Peggy Paganes (collectively "Defendants").  On April

7, 2004, Defendant Tubby's filed a counter claim for unpaid royalties, late fees and advertising

fees.

On May 19, 2005, Plaintiffs filed an 11 Count Amended Complaint alleging Violation of

Racketeering Influenced and Corrupt Organizations Act ("RICO"), Violation of the Robinson-

Patman Act, Violation of Michigan Franchise Investment Law, Common Law Fraud, Breach of

Contract, Breach of Covenant of Good Faith and Fair Dealing, Equitable Accounting, and

requesting a permanent injunction.

On July 6, 2005, Defendants filed a Motion to Dismiss, For Summary Judgment and to

Extend Time on the 11 Counts in Plaintiffs' Amended Complaint.[1]  Plaintiffs filed their

Response on July 29, 2005.  Defendants filed their Reply on August 15, 2005.

---

[1] The counts in Plaintiffs' Amended Complaint are:
| | |
|---|---|
| Count I: | Violation of RICO, 18 U.S.C. § 1962 |
| Count II: | Violation of the Robinson-Patman Act, 15 U.S.C. § 13(c) |
| Count III: | Violation of Michigan Franchise Investment Law, M.C.L. § 445.1505 |
| Count IV: | Common Law Fraud - Kickbacks |
| Count V: | Breach of Express Contract - Kickbacks |
| Count VI: | Breach of Covenant of Good Faith and Fair Dealing |
| Count VII: | Breach of Contract - Refusal to Approve Sales of Franchises |
| Count VIII: | Violation of the Michigan Franchise Investment Law, M.C.L. 445.1505 |
| Count IV: | Accounting for Use of Advertising Fees |
| Count X: | Fraud - Failure to Comply with Federal Trade Commission Act |
| Count XI: | Injunction |

2

Plaintiff Tubby's #14 and Tubby's 33 23 are Michigan corporations with their principal place of business in Sterling Heights, Michigan. (Am. Compl. ¶ 1, 2). Plaintiff Kulis Investment, Inc. is a Michigan corporation doing business or formerly doing business as Tubby's Sub Shop #0064 in Wixom, Michigan. (Am. Compl. ¶ 3). Plaintiff Lark Food Services, Inc. is a Michigan corporation which owns and operates Tubby's #0066 in Sterling Heights, Michigan. (Am. Compl. ¶ 4). Plaintiff TFD, Inc. is a Michigan corporation which currently (or formerly) owns and operates Tubby's Sub Shop #0089 in Taylor, Michigan. (Am. Compl. ¶ 5). Plaintiff TFI, Inc. is a Michigan corporation which currently (or formerly) owns and operates Tubby's Sub Shop #0107 in Eastpoint, Michigan. (Am. Compl. ¶ 6). Plaintiff FSM, Inc. is a Michigan corporation doing business as Tubby's Sub Shop #0016 in Livonia, Michigan. (Am. Compl. ¶ 7). Plaintiff Williams #25, Inc. is a Michigan corporation which previously operated Tubby's Sub Shop #0025 in Troy, Michigan. (Am. Compl. ¶ 8). Plaintiff Atto Sub, Inc. is a Michigan corporation currently (or formerly) doing business as Tubby's Sub Shop #0148 in Troy, Michigan. (Am. Compl. ¶ 9). Plaintiff MJB Enterprises, Inc. is a Michigan corporation currently (or formerly) doing business as Tubby's Sub Shop #0148 in Troy, Michigan. (Am. Compl. ¶ 10). Plaintiff Manden Enterprises, Inc. is a Michigan corporation currently (or formerly) doing business as Tubby's Sub Shop #0022 in Taylor, Michigan. (Am. Compl. ¶ 11). Plaintiff S&J Orchard, Inc. is a Michigan corporation doing business as Tubby's Sub Shop #0020 in Orchard Lake, Michigan. (Am. Compl. ¶ 12). Plaintiff Cartolan, Inc. is a Michigan corporation formerly doing business as Tubby's Sub Shop #0091 in Detroit, Michigan. (Am. Compl. ¶ 13). Plaintiffs In Chung, an individual and ICC Enterprises, a Michigan corporation, both do business as Tubby's Sub Shop #0086 in Pontiac, Michigan. (Am. Compl. ¶ 14). Plaintiff AWW, Inc is a Michigan corporation doing business as Tubby's Sub Shop #0024 in

Waterford, Michigan.  (Am. Compl. ¶ 15).  Plaintiff J&D Martin Enterprises, Inc. is a Michigan

corporation formerly doing business as Tubby's Sub Shop #0091.  (Am. Compl. ¶ 16).  Plaintiff

RM&M Tubby's, Inc. is a Michigan corporation doing business as Tubby's Sub Shop in

Livonia, Michigan.  (Am. Compl. ¶ 17).  Plaintiff Edgewood Sub Shops, Inc. is a Michigan

corporation formerly doing business as Tubby's Sub Shops #0072 in Commerce Township,

Michigan.  (Am. Compl. ¶ 18).  Plaintiff SubDude, LLC is a Michigan limited liability

corporation doing business as Tubby's Sub Shops #0105 and #0129.[2]  (Am. Compl. ¶ 19).

Defendant Tubby's is a Michigan corporation with a principal place of business in

Clinton Township, Michigan.  (Am. Compl. ¶ 21).  Tubby's franchises and manages franchises

which sell submarine sandwiches.  (Am. Compl. ¶ 31). Defendant SDS, SubLine, and Tubby's

Advertising  are Michigan corporations with their principal place of business in Clinton

Township, Michigan. SDS is a subsidiary of Tubby's since its incorporation on January 3, 1998.

(Am. Compl. ¶ 32).  SDS is the purchaser of all products sold to and used by Tubby's

franchisees.  (Am. Compl. ¶ 32).  SubLine is a subsidiary of Tubby's which provides franchisees

with equipment and remodeling services.  (Am. Compl. ¶ 33).  Tubby's Advertising is a

subsidiary of Tubby's and collects advertising money from franchisees and oversees the

expenditures of those funds for the benefit of Tubby's and its franchises.  Defendants Robert M.

Paganes, Peter T. Paganes and Peggy Paganes, are individuals who have been the sole

shareholders, Directors and Officers of Tubby's and its entities.  (Am. Compl. ¶ 33).  They

control all day to day operations of Tubby's and it entities.  (*Id.*).

In 1997, Tubby's formed SDS to enter into agreements with food manufacturers and

---

[2] All plaintiff parties mentioned above are collectively referred to as "Plaintiffs."

other distributors of products used by Tubby's franchises. (Am. Compl. ¶ 41). After entering into agreements with product manufacturers, SDS would administer the warehousing and distribution of the products, take orders from and deliver such products to franchisees and then invoice the franchisees for the products. (Am. Compl. ¶ 43). Tubby's franchisees were required to purchase their products from SDS. Dan Kauble ("Kauble") was hired to Tubby's to set up the SDS distribution system. (Pl.'s Br. 2).

Plaintiffs claim that Robert Paganes, Tubby's President, and Kauble set up a scheme where Kauble "negotiated product purchase contracts with manufacturers which included substantial kickbacks paid by the manufacturers to Tubby's." (*Id.*). Plaintiffs allege that SDS then added an additional mark up to the manufacturers' invoices when it resold the goods to the franchisees. When SDS paid the manufacturers' invoices, the manufacturers paid Tubby's a kickback. According to Plaintiffs, the kickback scheme consisted Tubby's asking their manufacturers to increase prices by 30 - 90%, and then to bill SDS at the inflated amounts. (Am. Compl. ¶ 45). When billing the franchisees, SDS would add its overhead and profit to the amount submitted by the manufacturers.[3] (*Id.*). Upon receiving the bill, Plaintiffs and other franchisees would pay the SDS invoices, SDS would then pay the manufacturers the entire invoice amount, and in return, the manufacturers would pay SDS the kickback. (*Id.*). Plaintiffs contend that Tubby's expanded its scheme to include sales of equipment, conversion of the franchisees' money in their Pepsi Flex Fund, and advertising fees paid by the franchisees. (Pls.' Br. 2-3).

Plaintiffs filed a Partial Summary Judgment Motion on August 19, 2005. Defendants

---

[3] Plaintiffs claim that the bills to the franchisees consisted of: 1) the Product Manufacturers original prices; 2) the amount of the kickback; and 3) SDS' overhead and profit.

filed a response on September 9, 2005, and Plaintiffs filed their reply on September 26, 2005.

Defendants filed their Second Motion for Summary Judgment on September 9, 2005.  Plaintiffs

filed their response on October 3, 2005, and Defendants filed their reply on October 6, 2005.

On December 29, 2005, this Court granted Defendant's Motion to Dismiss on Counts I

and II.

The Court analyzes Defendants Motion for Summary Judgment under Federal Rule of

Civil Procedure 56.  Defendants' remaining arguments are: (1) Plaintiffs' first Michigan

Franchise Investment Law ("MFIL") claim should be dismissed because Tubby's did not breach

the two percent contract limitation; (2) Plaintiffs' fraud claim is barred by the statute of

limitations; (3) Plaintiffs' breach of contract claim fails because the two percent provision

applied to Tubby's and not SDS; (4) Michigan law does not recognize an independent cause of

action of a breach of the implied covenant of good faith; (5) Plaintiffs' second Michigan

Franchise Investment Act claims should be dismissed because Tubby's was not obligated to

make the disclosures; (6) Equitable Accounting is only available when discovery is insufficient;

(7) there is no private cause of action under the Federal Trade Commission Act; and (8) Five

Plaintiffs signed termination agreements and have released Tubby's from all claims.

Plaintiffs respond that: (1) Defendants failure to disclose SDS and profits made from

SDS in their Item 8 disclosure is a violation of the Michigan Franchise Investment Law; (2)

They did not know and could not have known about Defendants' breach of contract until Mr.

Kauble's deposition; (3) The two percent rebate provision applied to SDS as a third-party

distributor, and if Plaintiffs thought the provision did not apply, they could have changed the

provision; (4) A breach of the implied covenant of good faith and fair dealing is actionable under

Michigan law; (5) Equitable accounting is necessary because it is impossible to obtain the

6

information necessary to determine the extent of Defendants' misuse of advertising fund without forensic accounting; (6) Defendants failure to disclose SDS and profits made from SDS in their Item 8 disclosure is a violation of the Federal Trade Commission Act and thus actionable fraud. Plaintiffs also argue that the five Plaintiffs who released their claims against Tubby's did not release their claims against any of the other Defendants.

**Defendants' Motion to Dismiss, Motion for Summary Judgment, and Motion to Extend Time**

**II.     ANALYSIS**

   **a.     Standard**

A complaint brought under Federal Rule of Civil Procedure 12(b)(6) should not be dismissed for failure to state a claim, "unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Hoover v. Ronwin*, 456 U.S. 558, 587, 104 S. Ct. 1989; 80 L. Ed. 2d 590 (1984). For purposes of a motion to dismiss, the pleadings and affidavits are viewed "in a light most favorable to the Plaintiff." *Niemi v. NHK Spring Co.*, 276 F. Supp. 2d 717, 719 (E.D. Mich. 2003).  All factual allegations and any inferences derived from those allegations must be accepted as true. *Cheriee Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994).  "If, on a [motion to dismiss] . . . , matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgement and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to represent all material made pertinent to such a motion by Rule 56." FED. R. CIV. P. 12(b).

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R.

CIV. P. 56(b).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary

judgment.  *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e).  The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "'[C]onclusory' allegations unsupported by 'specific' evidence will be insufficient to establish a genuine issue of fact."  *Id.* (citations omitted).  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 902 (1990).

"[T]he showing (whether as to standing or the merits) required to overcome a motion for summary judgment is more extensive than that required in the context of a motion to dismiss." *Id*.  "The principal difference is that in the former context[,] evidence is required, while in the latter setting the litigant may rest upon the allegations of his complaint."  *Id.* (citations omitted); *see* FED. R. CIV. P. 56(e) (requiring the "nonmoving party to go beyond the pleadings.").

**b.     Discussion**

**1.     Violation of Michigan Franchise Investment Law (Count III)**

In their Compliant, Plaintiffs allege that:

Defendants' failure to disclose in the Uniform Franchise Offering Circulars ["UFOCs"] filed pursuant to the Michigan Franchise Investment Act, failed to comply with MCL 445.1505 in that [Defendants] failed to disclose: (i) that Tubby's had *negotiated the payment of Kick Backs* as described in the SDS Kick Back Scheme from Product Manufacturers, or (ii) that Tubby's had *promised a 20% reduction in product costs* to franchisees because of the volume purchasing power of SDS, or (iii) that the *SDS Kick Back Scheme violated the limitation in the franchise agreements* relating to limiting rebates to 2%, and, or (iv) that substantially all of Tubby's profits were derived from revenues received as a

result of the SDS Kick Back Scheme.

(Compl. ¶ 92) (emphasis added).

In regards to this count, Defendants argue that the MFIL only imposes liability in connection with an offer or sale of a franchise and does not apply to any conduct or transaction after the initial sale. Defendants claim that there were only seven franchise agreements signed since 1999, and only two or three of the Plaintiffs who signed those agreements have potential claims.

For those two or three Plaintiffs that have potential claims, Defendants first argue that the two percent contract limitation fails because the limitation was not breached. Even if breached, Defendants assert that they disclosed the SDS gross markup in the UFOC. Thus, Defendants claim that no franchisee could reasonably rely on the two percent rebate. Second, Defendants assert that their failure to disclose the alleged twenty percent price reduction promise is not fraud because Plaintiffs alleged in their Amended Complaint that the promise was untrue when stated at a franchise meeting years earlier. Third, Defendants contend that regarding alleged kickbacks for store 66, the UFOC made no representation about the prices SDS would charge and they made no misleading statement to which an omission can attach. Fourth, Defendants argue that though the UFOC states that SDS' purchasing power results in lower prices, the statement does not comment on the comparison which makes the SDS prices lower.

Plaintiffs argue Tubby's made the conscious decision not to make material disclosures in the UFOCs. Plaintiffs assert that the information in the disclosures is material, and that failure to make the disclosure damaged those stores who relied upon it. Plaintiffs contend that Defendants had a legal duty to make the disclosures and that they breached their duty by failing to do so.

Section 5 of the MFIL provides:

10

A person shall not, in connection with the filing, offer, sale, or purchase of any franchise, directly or indirectly:

(a) Employ any device scheme, or artifice to defraud.
(b) Make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.
(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

M.C.L. § 445.1505.  Section 5 "only imposes liability on a person who offers or sells a franchise."  *Franchise Mgmt. Unlimited, Inc v. America's Favorite Chicken*, 221 Mich. App. 239, 250 (1997).  The MFIL defines the term "franchise" as follows:

"Franchise" means a contract or agreement, either express or implied, whether oral or written, between 2 or  more persons to which all of the following apply:

(a) A franchisee is granted the right to engage in the business of offering, selling, or distributing  goods or services under a marketing plan or system prescribed in substantial part by a franchisor.

(b) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate.

(c) The franchisee is required to pay, directly or indirectly, a franchise fee.

M.C.L. § 445.1502(3).  The MFIL does not apply to "the renewal or extension of an existing franchise where there is no interruption in the operation of the franchised business by the franchisee." M.C.L. § 445.1503.  Reasonable or justifiable reliance is necessary for a MFIL claim.  *Cook v. Little Caesar Enters., Inc.,* 210 F.3d 653, 659 (6th Cir. 2000).  The statute of limitations on a MFIL claim is four years from the act or transaction constituting the violation. M.C.L. § 445.1533.

11

Defendants allege that seven stores signed franchise agreements since 1999[4] – stores 64, 66, 16, 107, 148, 91 and 54.  Plaintiff does not dispute this contention.  Plaintiff also does not dispute that Store 148 is barred by the statute of limitations, and that Stores 64, 16, and 54, which  renewed their franchise agreements after the beginning of 1999, are not covered by the MIFL.[5]

The Court finds that Plaintiff concedes that Store 148 is barred by the statute of limitations.  The Court also finds that Stores 64, 16, and 54 are not covered by the MIFL because they only renewed their franchise agreement after 1998.  Thus, the Court focuses solely on Stores 66, 107 and 91.

Defendants contend that Store 107's stockholder/CEO, Fred Inda ("Inda"), was a stockholder of other Tubby's franchises.  (Def.'s Br. 7; Baris Decl. ¶ 5).  Defendants claim that Inda's other stores purchased from SDS in 1998, and therefore he had actual knowledge of the prices SDS charged.  Defendants contend that Inda did not rely on the statements made in the UFOC.

In regards to Store 107, Defendants proffer the Barish Declaration as evidence that Inda purchased from SDS beginning in 1998.  Plaintiffs respond that the franchise which were purchased after 1997 relied upon the UFOCs and were damaged due to Defendants' non-disclosures.

The Court finds that just because the store owner previously purchased from SDS does

_____

[4] SDS was created in 1999, and thus the Court is only concerned with those franchise agreements signed after the its creation.

[5] These stores are not covered by the MFIL because it does not apply to "the renewal or extension of an existing franchise where there is no interruption in the operation of the franchised business by the franchisee."  M.C.L. § 1503.

not mean that he did not rely on the UFOC.  Further, Defendants only contend that Inda purchased from SDS in 1998, which is within the 1998 - 2004 time frame – the focus of Plaintiff's argument on this count.  If Inda was misled regarding SDS beginning 1998, that certainly should not bar any subsequent franchises he purchased from being included in this count.  In a light most favorable to Store 107, failure to make the proper disclosures are material, regardless of whether the owner purchased from SDS prior to signing the franchise agreement for that store.[6]  Accordingly, Store 107 remains under the Court's jurisdiction.

　　　With the remaining three stores – Stores 66, 91, and 107 – Defendants claim that the disclosure in the UFOC made no representation about the prices SDS charged the franchises, thus there was no misleading statement to which an omission claim can attach.  Further, Defendants argue that the financial statements in the UFOC disclose an average markup of

---

　　　[6] Kauble testified:

Q:　　Through . . . the '99 UFOC, has there been any disclosure similar to the Sub Line disclosure for SDS?

A:　　No.

Q:　　Why?

A:　　Because we were making too much money.  *We didn't want to disclose that.*
　　　. . . .

Q:　　From the point of view of your position as a manager and responsible person in putting together the UFOCs for the period of time that you had the responsibility in the franchisee agreements, why did you decide in conjunction with others who had that responsibility, not to make the same kind of disclosure for SDS that had historically been made for Subway?

A:　　Because Bob [Paganes] had this fear if the franchisees saw the kind of money we were making from SDS, as I said earlier, they would have stormed the office.
　　　Bob directed me – I wanted to put those in there and *Bob directed me not to and we changed it.*
　　　This all goes out – this is a circular that goes out for few candidates, not only in Michigan but throughout the country.  If you send this out to a new candidate, and say, I want you to get involved into a franchising system that not only makes three and-a-half percent advertising; six percent royalties but I am going to make a million dollars on distribution, they are not going to buy the program.

(Pls.' Resp. Ex. 1, Kauble Dep. 152:22-25, 153:1-8, 21-25, 154:1-10) (emphasis added).

13

almost thirty percent in the 1999 UFOC, and 35% in the 2000 UFOC.  Plaintiffs argue that the disclosure in Item 8[7] was not made until the 2004 UFOC.

Taken in a light most favorable to Plaintiffs, the Court finds that there is a genuine issue of material fact whether Defendants made the proper disclosures.  Defendants 1998 - 2002 UFOCs state a two percent rebate.  (*See* Pls.' Resp. Ex. 11).  It is not until the 2003 UFOC that Dependants dropped the two percent language and mention their revenues from product sales and rebates.  (*Id*.).

Defendants argue that they provided financial statements with the UFOC, from which the actual markup of the products could be deduced.  The Court does not find this argument persuasive.  Defendants still included the two percent rebate amount in the UFOC, and Plaintiffs claim they relied on that statement.  Accordingly, the Court denies Defendants' Motion for Summary Judgment as to Tubby's  on the MFIL claim for Stores 66 and 99, but grants the motion as to the other Defendants.  Additionally, the Court grants Defendants' Motion for Summary Judgment against the remaining Plaintiffs.

### 2.     Michigan Franchise Investment Law (Count VIII)

Defendant argues that Tubby's was not obligated to disclose the existence of SDS in the UFOC because SDS was an affiliate of Tubby's.  According to Defendants, the rule only requires disclosure about revenue the franchisor received from their party suppliers.  Defendants further argue that the Item 8 instructions provided for a disclosure of the franchisor's total revenues and the portion that comes from the required purchases.  Finally, Defendants contend that even if the UFOC was deficient in its disclosure, the count should be dismissed because the

---

[7] Item 8 disclosures are required by the Federal Trade Commission Act, 16 CFR § 436.1, and the UFOC Guidelines.

applicable statute covers fraud; and there was no misleading or incomplete information that would constitute fraud under the MFIL.

Plaintiffs respond that Tubby's was required to disclose the existence of SDS and the amount of revenue derived from SDS by Tubby's in Item 8 of their UFOC, under the UFOC Guidelines ("Guidelines").  Plaintiffs contend that Defendants failure to disclose is a violation of Mich. Comp. Laws section 445.1505.  Plaintiffs argue that Tubby's made a partial disclosure stating the existence of SDS, but did not comply with the remaining Item 8 required disclosures relating to revenues derived from franchisees purchases from SDS.  Plaintiffs assert that Defendants point to no language in Item 8 that precludes the disclosure of revenue derived by the franchisor from its subsidiary corporation.  Further, Plaintiffs state that in 2004, Tubby's made the complete required disclosures, showing that they were aware of their previous non-compliance.  Plaintiffs aver that Defendants offer no legal authority supporting the granting of summary judgment on this count.

Defendants reply that Plaintiffs did not acknowledge the fraud requirements of the claim in their Response.  Defendants argue that a fraud claim for nondisclosure cannot logically be asserted where the disclosure were made in the document.

The disclosure franchisors must make to franchisees and potential franchisees is controlled by the Federal Trade Commission Act, 16 C.F.R. § 436.1.

> In connection with the advertising, offering, licensing, contracting, sale, or other promotion in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, of any franchise, or any relationship which is represented either orally or in writing to be a franchise, it is an unfair or deceptive act or practice within the meaning of section 5 of that Act for any franchisor or franchise broker:
>
> > (a) To fail to furnish any prospective franchisee with the following information accurately, clearly, and concisely stated, in a legible,

15

written document at the earlier of the "time for making of
disclosures" or the first "personal meeting":

. . . .

    (11) A description of the basis for calculating, and,
if such information is readily available, the actual
amount of, *any revenue or other consideration to be
received by the franchisor or persons affiliated with
the franchisor* from suppliers to the prospective
franchisee in consideration for goods or services
which the franchisor requires or advises the
franchisee to obtain from such suppliers.

16 C.F.R. § 436.1(a)(11) (emphasis added).  The Federal Register on this section explains that:

[T]he disclosure requirements of section 436.1(a)(11) of the rule provide for a
description of the basis for calculating, and, if such information is readily
available, the actual amount of any revenue or other consideration to be received
by franchisor, *or persons affiliated with the franchisor*, from suppliers to the
prospective franchisee in consideration for goods or services which the franchisor
requires or suggests that the franchisee obtain from such suppliers.

43 Fed. Reg. 59658 (emphasis added).  The Federal Regulations also state that the purpose of the

disclosure required by § 436.1(a)(11) is to "alert a franchisee to the presence of [a] 'kickback'

arrangement[], *whenever the franchisor 'requires' or 'advises' that the franchisee do business

with a particular supplier or group of suppliers*."  43 Fed. Reg. 59659 n.231 (emphasis added).

    Additionally, the Guidelines for preparation of the UFOC state:

iii.  For 'precise basis,' disclose the franchisor's total revenues and the
franchisor's revenues from all required purchases and leases of products and
services.  Also, disclose the percentage of the franchisor's total revenues
represented by the frachisor's revenues from required purchases or leases.  *If the
franchisor's affiliates also sell* or lease products or services to franchises, *disclose
affiliate revenues from those sales or leases*.  These amounts should be taken
from the franchisor's statement of operations (or profit and loss stated) from the
most recent annual audited financial statements attached to the offering circular.

(Pls.' Resp. Ex. 7, Guidelines for Preparation of the UFOC and Related Documents ¶ 5760)

(emphasis added).   According to the FTC, compliance with the Guidelines would be sufficient

under the FTC rule.  (Barish Decl Ex. 12, Amended Franchise Rule 12/30/93; Defs.' Br. 15).

Mich. Comp. Laws section 445.1505 provides:

> A person shall not, in connection with the filing, offer, sale, or purchase of any franchise, directly or indirectly:
>
> > (a) Employ any device scheme, or artifice to defraud.
> > (b) Make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, no misleading.
> > (c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

In the instant case, taking the facts in a light most favorable to the non-moving party, the Court finds that there is a genuine issue of material fact whether Tubby's must report (1) the revenue generated from SDS, and (2) the amount of the rebate/kickback that Tubby's received from SDS in their item 8 disclosure. While Defendants claim that such disclosure is not required, the rules stated above suggest otherwise. Further, if Tubby's was required to make the disclosure and failed to do so, a genuine issue of material fact exists whether its failure to disclose was fraudulent and therefore a violation of Mich. Comp. Laws section 445.1505. Accordingly, the Court denies Defendants' Motion for Summary Judgment as to Tubby's on Plaintiffs' second MFIL claim, but grants the motion as to the remaining Defendants. It does not appear that the other Defendants are also responsible for the nondisclosure.

### 3.   Fraud due to a violation of the Federal Trade Commission Act (Count X)

Defendants argue that the FTCA does not afford a private right of action for a violation of the Act. Defendants contend that the FTCA does not require disclosure of kickbacks, even if they occurred.

Plaintiffs respond that this is an action for fraud in failing to make the required Item 8 disclosures per the Guidelines, not a claim for a private right of action under the FTCA.

Plaintiffs' claim that the evidence of the fraud is the failure to make the FTCA disclosures. Plaintiffs' assert that for the same reasons as applicable in Count VIII, the disclosure was required by Defendants. Plaintiffs allege that Defendants were obligated under the FTCA to include the information on SDS required by Item 8 of the UFOC Guidelines after 1998 and knew that if they that the failure to comply with the FTCA and the Guidelines relating to the disclosure of the SDS kickback scheme constitute a knowing and intentional failure to disclose material information.

The Court agrees with Plaintiffs and denies Defendants' Motion to Dismiss this count.

In connection with the advertising, offering, licensing, contracting, sale, or other promotion in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, of any franchise, or any relationship which is represented either orally or in writing to be a franchise, it is an unfair or deceptive act or practice within the meaning of section 5 of that Act for any franchisor or franchise broker:

> (a) To fail to furnish any prospective franchisee with the following information accurately, clearly, and concisely stated, in a legible, written document at the earlier of the "time for making of disclosures" or the first "personal meeting":
> . . . .
>> (11) A description of the basis for calculating, and, if such information is readily available, the actual amount of, *any revenue or other consideration to be received by the franchisor or persons affiliated with the franchisor* from suppliers to the prospective franchisee in consideration for goods or services which the franchisor requires or advises the franchisee to obtain from such suppliers.

16 C.F.R. § 436.1(a)(11) (emphasis added). The Federal Register on this section explains that:

> [T]he disclosure requirements of section 436.1(a)(11) of the rule provide for a description of the basis for calculating, and, if such information is readily available, the actual amount of any revenue or other consideration to be received by franchisor, *or persons affiliated with the franchisor*, from suppliers to the prospective franchisee in consideration for goods or services which the franchisor requires or suggests that the franchisee obtain from such suppliers.

43 Fed. Reg. 59658 (emphasis added). The Federal Regulations also state that the purpose of the

disclosure required by § 436.1(a)(11) is to "alert a franchisee to the presence of [a] 'kickback'

arrangement[], *whenever the franchisor 'requires' or 'advises' that the franchisee do business*

*with a particular supplier or group of suppliers*." 43 Fed. Reg. 59659 n.231 (emphasis added).

Additionally, the Guidelines for preparation of the UFOC state:

> iii. For 'precise basis,' disclose the franchisor's total revenues and the
> franchisor's revenues from all required purchases and leases of products and
> services. Also, disclose the percentage of the franchisor's total revenues
> represented by the frachisor's revenues from required purchases or leases. *If the*
> *franchisor's affiliates also sell* or lease products or services to franchises, *disclose*
> *affiliate revenues from those sales or leases*. These amounts should be taken
> from the franchisor's statement of operations (or profit and loss stated) from the
> most recent annual audited financial statements attached to the offering circular.

(Pls.' Resp. Ex. 7, Guidelines for Preparation of the UFOC and Related Documents ¶5760)

(emphasis added). The FTC has stated that compliance with the Guidelines would be sufficient

under the FTC rule. (Barish Decl Ex. 12, Amended Franchise Rule 12/30/93; Defs.' Br. 15).

Mich. Comp. Laws section 445.1505 provides:

> A person shall not, in connection with the filing, offer, sale, or purchase of any
> franchise, directly or indirectly:
>
> > (a) Employ any device scheme, or artifice to defraud.
> > (b) Make any untrue statement of material fact or omit to state a
> > material fact necessary in order to make the statements made, in
> > the light of the circumstances under which they are made, no misleading.
> > (c) Engage in any act, practice, or course of business which
> > operates or would operate as a fraud or deceit upon any person

The Court finds that Plaintiffs can prove a set of facts which may entitle them to relief.

An issue exists whether Tubby's must report the revenue, under the FTCA and Guidelines,

generated from SDS and the amount of the rebate/kickback that Tubby's received from SDS, in

their Item 8 disclosure. While Defendants claim that such disclosure is not required, the rules

stated suggest otherwise.  Further, if Tubby's was required to make the disclosure and they did

not, an issue exists whether the failure to disclose was fraudulent and therefore a violation of the

FTCA.  Accordingly, the Court denies Defendants' Motion to Dismiss Count X.

### 4.    Common Law Fraud (Count IV)

Defendants argue that Plaintiff's common law fraud claim is barred by the six year

statute of limitations.  Defendants assert that the action was commenced in March of 2004, two

months after the six year state of limitations expired.  Plaintiffs were allegedly told by

Defendants, at a franchise meeting in January of 1998, that if they purchased all of their products

from SDS, their costs would be immediately reduced by twenty percent.  Plaintiffs claim that

they did not know or should not have known before March 11, 1998, that the promise made by

Defendants was a lie.  Plaintiffs also argue that the fraudulent representation was concealed,

giving them up to two years after they were made aware of their cause of action, in which to

bring a claim.   Plaintiffs assert that they were not aware of the concealment until Kauble's

deposition testimony.[8]

---

[8] Kauble testified:

Q:    You testified yesterday that the 20 percent you promised them didn't happen, what
       actually happened to pricing and product quality and what was the effect on the
       franchisee base?
       . . . .
A:    The pricing and the quality issues – the pricing of the products either stayed the same or
       went up and to disguise that we used you're getting a better quality product scheme.
       . . . .
       The pricing of the product stayed the same or went up if we had to improve, if we had to
       use, well, we are going to improve your quality.  So, we have a better product not a better
       price.
       The price of some products were reduced only because we lowered the quality of the
       product and were able to maintain the level of kick-back – maintain or increase –
       actually, each year, in the early-on years, we increased the level of the kick-back.  So,
       you know, what we did by negotiating different products with different manufacturers
       was a direct relationship to how many dollars we could keep in the offers for a kick-back

The statute of limitations period commences when the plaintiff knew or should have known of the fraud or misrepresentation. *Fagerberg v. LeBlanc*, 164 Mich. App. 349, 354 (1987); *Nagel v. First of Michigan Corp.*, 784 F. Supp. 429, 435 (W.D. Mich. 1991); *Harner v. Prudential-Bache Secs., Inc*., 1994 WL 494871, *3 (6th Cir. Sept. 8, 1994) (unpublished). If the fraudulent concealment is discovered immediately preceding the expiration of the six years during which the plaintiff was entitled to bring suit, the period is enlarged no less than the full period of two years from the date of discovery of the fraudulent concealment. *Unemployment Compensation Comm'n v. Vivian*, 318 Mich. 598, 611 (1947); *see also* M.C.L. § 600.5855.

At the motion hearing, Defendants quoted deposition testimony of individual Plaintiffs to support their assertion that Plaintiffs had actual knowledge that SDS prices were not discounted twenty percent, prior to learning of Kauble's testimony.[9] The testimony was of nine Plaintiffs who, in Defendants' opinion, admit that they were aware early on that there was no decrease in costs. (*See generally*, Pls.' Supp. Br. Ex. A). Plaintiffs responded that the quotes were taken out of context, and that the testimony actually supports their proposition that Plaintiffs did not know about it until Kauble's deposition testimony on 2003. Subsequently, the Court granted leave for Plaintiffs to submit a supplemental brief outlining the testimony which Plaintiffs felt supported their proposition.

When viewing the testimony, it appears there is a genuine issue of material fact as to

---

scheme. Whether the price went up, went down, stayed the same, we could adjust the quality of the makeup of the product to meet our needs.
(Pls.' Resp. Ex. 1, Kauble Dep. 20:13-16, 23-25, 21:8-25).

[9] Defendants also cite to deposition testimony of franchisees in their reply brief. Defendants reply brief argues testimony states that many franchise owners learned early on that their costs were not going down. (*See* Alterman Decl Ex. 3, 4, 5; Defs.' Reply 3).

whether Defendants committed fraud and concealed a cause of action from Plaintiffs.

Mich. Comp. Laws section 600.5813 provides that causes of action which are based upon

fraud must be brought within a six-year period beginning after the claim(s) accrue.  Additionally,

Mich. Comp. Laws section 600.5855 allows plaintiffs an additional two years after the

fraudulent concealment is uncovered to file a suit.

> Under the two sections above quoted, a plaintiff now has, in any case, the full
> period of six years from the date of the fraudulent act, or other act creating his
> cause of action, within which to institute suit, and moreover, where the defendant
> has fraudulently concealed from him his cause of action, he has, under any
> circumstances, not less than the full period of two years from date of discovery in
> which to bring his action.

*Boyle v. General Motors Corp*., 468 Mich 226, 230 (2003).

Although Defendant argues that Plaintiffs had actual knowledge that their costs were not

decreasing, there is testimony by Plaintiffs that shows a genuine issue of material fact whether

Kauble and Defendants continued to conceal that SDS was never going to reduce costs.   Kevin

Weinberg,[10] Jeffrey Kulis,[11] Galen Jorgensen,[12] and Judith Ortoloan[13] contacted Kauble when

---

[10] "Basically I said that were looking for our 20 percent, we haven't seen it yet and he basically told me to be patient, everybody's got to get on board for the program to work, and he also stated that 20 percent's just the beginning."  (Weinberg Dep. 30:2-6).

[11]      A:       [A]t some point in time . . . I finally discovered what was going on [and] I did
            make contact with Dan.
         Q:       When was that?
         A:       Probably at least six months into this.
         Q:       What did Mr. Kauble tell you?
         A:       They're working on it
                        . . . .
         A:       That seems to be a fairly normal statement.
(Oct. 8, 2004 Kulis Dep. 69:15-25).

         Q:       You would agree that March 19th, 2001 is after the date that you learned that you
            were not receiving a twenty percent reduction in price?
                        . . . .

they thought that they were not getting the reduction, and were told by Kauble that the decease

was forthcoming.  Instead of responding truthfully to the Plaintiffs who contacted him, Kauble

lead them to believe that a reduction in costs would occur in the future.  Even if Plaintiffs

suspected that their costs were not going down, Kauble's response to the inquiries concealed

Tubby's true intentions about the cost reduction plan.  Further, Cheryl Carr,[14] Jeffrey Kulis,[15] and

Galen Jorgensen[16] testified that Defendants changed the price and quantities, making it hard for

---

     A:    But there were still – you know, all the way through, you know, discussions with
           Shannon, you know, about how they're working on the prices.  I mean, there were
           representations as to still – they're still working on getting that food cost down.
(Oct. 8, 2004 Kulis Dep. 115:21-23, 116:1-5).

     Q:    By August 8th, 1998, your prices had not gone down –
     A:    Correct.
     Q:    – from SDS?  Yet you were appreciative of the Tubby's efforts?
     A:    Well, because they continued to tell me they were working on the problem.
(Oct. 8, 2004 Kulis Dep. 145:9-14).

[12]  Q:    I'm trying to determine whether or not you had – you called immediately after
           you learned that you did not get a twenty percent reduction to somebody within
           the first week or two.
     A:    I called Dan Kauble
     Q:    What did Mr. Kauble say?
     A:    We're working on it.
(Jorgensen Dep. 124:2-9).

[13] "We weren't seeing a reduction in our food costs because something about the trucks . . .
problems with their truck. . . . problems in the warehouse.  They were going to have to look for a
new place." (Ortolan Dep. 165:7-11)

[14] "I know immediately there was no cost savings because they told us there was going to be
an immediate twenty percent reduction . . . I told you when the product kept changing weekly
depending on what kind of buy they could get for them. . . . whenever they changed the product,
whenever the cost when down the quality went down as well." (Carr Dep. 120:6-12, 121:8-10)

[15] "[T]here is no way for anybody to compare [products to determine whether the stores are
saving money]." (Kulis Dep. 120:18)

[16] "At first [the prices] started sneaking up gradually.  Then what would happen is that they
would change the product and say [] we've changed products.  We feel it's a better product but

them to tell if their store costs were reduced.  This testimony also supports the theory that Kauble's actions were an attempt to hide what Tubby's and SDS were doing, *i.e.*, getting all of the franchisees on board with SDS as the distributor ,and promising lower costs with the intent of never actually reducing costs.

In regards to whether other Plaintiffs had actually knowledge of Defendants' scheme, Steve Weinberg stated that his brother, Kevin Weinberg, handled the purchasing and running side of the store.  (S. Weinberg Dep. 83:21-23).  He could not recall when he knew that his store was not getting a twenty percent reduction in costs.  (*Id.*).  Shi Jong Rho did not remember when the prices charged by SDS were higher.[17]  (Rho Dep. 47:12).  Thomas Oldham only testified that he realized prior to March 8, 2002, that there was not a twenty percent reduction in costs. (Oldham Dep. 45:15-17).[18]

Viewing the testimony in a light most favorable to Plaintiffs, there is a genuine issue of material fact (1) whether Defendants fraudulently concealed the fact that prices would not be reduced, and (2) regarding when Plaintiffs had actual knowledge, or should have had actual knowledge, that Defendants did not intend to reduce costs.

Accordingly, the Court denies Defendants' Motion as to Tubby's, but grants the motion as to the remaining Defendants.

### 5. Breach of Contract (Count V)

---

the price will double.  So with all the different packaging you had to figure [whether the prices went up compared to quality]."  (Jorgensen Dep. 124:22-25, 125:1).

[17] Rho testified that he only had a "feeling" that the prices were higher.  He never stated that he was sure.  (Rho Dep. 47:12-20).

[18] Defendant also proffered a summary of David Jaworski's testimony, but this Court did not receive the applicable pages of the deposition from either Plaintiffs or Defendants.

Plaintiffs argue that the franchise agreement only allowed a two percent rebate for all product sales to the franchisee. Plaintiffs claim that Defendants breached their express contracts with Plaintiffs by negotiating "kickback" agreements with Product Manufacturers of products sold to SDS and resold to Plaintiffs and other franchisees, which required said suppliers to "kickback" to Tubby's rebates substantially in excess of the two percent permitted.

Defendants contend that the two percent provision was included in the franchise agreement when the franchisees purchased their supplies from third-party manufacturers. Defendants argue that because Tubby's sales go through SDS, the two percent provision is unnecessary because SDS is the contractual purchaser from the vendors and the contractual seller to the franchisees.[19] Defendants contend that the fee is irrelevant where SDS itself is the distributor and is responsible for all distributory functions, especially considering that SDS has the full profit or loss distributor positions. Finally, Defendants argue that it is absurd to limit all costs and profits to two percent. Defendants moves to dismiss this count solely on Plaintiff's alleged failure to state a claim.

Plaintiffs respond that if Defendants wanted to follow a different policy, they had the opportunity, each year, to change the language to conform with its use of SDS. Plaintiffs claim that the language did not change in the franchise agreements until 2003. Plaintiffs assert that the changes to the franchise agreement were not made, in order to avoid disclosure of the "kickback" scheme. Plaintiffs argue that this is a question of contract interpretation and that the interpretation must be left to the trier of fact.

Defendants reply that contract interpretation is only a jury issue when the contract is

---

[19] SDS operates like a middleman between the manufacturers of the products and the franchisees.

ambiguous.  Alternatively, Defendants argue that the alleged kickback scheme is not a rebate,

but a bookkeeping entry, or exchange of checks, which nets to zero.

>The provision in the franchise agreement at issue states:

>Franchisor requires some approved suppliers of food products to pay a two (2%) percent rebate for all sales to Franchisee.  Franchisee . . . agrees that Franchisor has the right to collect all such rebates . . . that are payable to Franchisor or Franchisee from the suppliers of products in connection with the purchases of products by Franchisee.  Franchisee is required to fully cooperate with Franchisor in the collection of such rebates and fees. The Fees collected will help fund services provided by the Franchisor.  These services include: full-time staff to monitor and negotiate all purchases made by suppliers, trips to manufacturers, testing of products, legal and accounting fees, food shows and seminars, constant monitoring and meetings with brokers, bakers, and syrup companies.  All other monies not spent for these and other activities are considered income to Franchisor.

(Pls.' Resp. Ex. 11, Franchise Agreement, Ex. B).

>It appears that Defendants are trying to get around the above contract provision by

creating SDS to add the "kickback" amount to the costs of the products, thereby relieving

Tubby's of staying within the two percent refund limit.  Instead of the franchisees purchasing

their goods directly from approved product manufacturers - from which Tubby's may take up to

two percent of those purchases as a rebate - Tubby's has now created SDS, which negotiates a

price from the suppliers, buys from those suppliers, and then re-sells the products to the

franchisees.  The price that SDS negotiates includes a rebate/kickback in excess of the two

percent rebate contemplated in the franchise agreement.  Plaintiffs signed the franchise

agreement with the understanding that they would not be paying more than a two percent markup

on the goods they purchased from suppliers.

>The Court finds that a genuine issue of material fact exists as to whether Defendants

breached the contract by (1) adding SDS into the equation as the lone approved distributor, and

(2) denying Plaintiffs an opportunity to negotiate and buy their goods directly from suppliers. This action forced the franchisees to pay the large markup, that SDS negotiated with the suppliers.[20]  Due to the Defendants' actions, Plaintiffs are now paying more then the stated markup in the franchise agreement.  Accordingly, the Court denies Defendants' Motion to Dismiss as to Tubby's and SDS, on Plaintiffs' Count V.  The motion is granted on this count as to the remaining Defendants.

### 6.    Breach of Implied Covenant of Good Faith and Fair Dealing (Count VI)

In this Count, Plaintiffs allege that they entered into the Tubby's franchise agreement with the good faith belief that Tubby's would treat Plaintiffs fairly.  Plaintiffs claim that Tubby's breached this covenant when it chose product manufacturers based on who would participate in the kickback scheme, which lead to Plaintiffs buying higher priced items.  Plaintiffs rely on the same passage of the franchise agreement as in the previous Count.

Defendants argue that though a covenant of good faith and fair dealing is implied in some contracts, "it does not create a separate duty of fairness and reasonableness which can be independently breach and does not support an independent cause of action for breach of that obligation."  (Defs.' Br. 13).  Defendants contend that if the covenant does exists, it cannot be used to override the terms of an express contract.

Plaintiffs respond that a breach of the covenant of good faith and fair dealing is an independent cause of action when there is an abuse of a discretionary obligation in an express

---

[20] In effect, Defendants are breaching the contract by adding themselves into the buyer-seller relationship in an effort eliminate a direct sale by the supplier to the franchisee, thereby eliminating the two percent markup requirement.  By adding SDS as the middleman, the franchisees cannot stop SDS from negotiating whatever markup it wants and the franchisees have no choice to buy from SDS, since it is the only approved seller/distributor.

contract.  Plaintiffs contend that the language – "All equipment, machines, food products, etc. used in the Franchise Business must meet the *specifications of Franchisor* and must be purchased from an approved supplier" – gives Defendants discretion to choose suitable product manufacturers and those decisions should not be done in bad faith, *e.g.,* to injury the other party. Plaintiffs claim that Defendants were motivated to choose the product manufacturers who would participate in the kickback scheme, not by those manufacturers who would reduce the franchisees' product costs.

Defendants reply that because Tubby's expressly reserved the right to approve specifications and suppliers, the implied covenant does not override Tubby's express right.

Michigan law recognizes an implied covenant of good faith and fair dealing, which applies to the enforcement and performance of contracts.  M.C.L. § 440.1203; *Burton v. Beaumont Hospital*, 373 F. Supp. 2d 707, 718 (E.D. Mich. 2005).  "Michigan does not . . . recognize a claim for breach of an implied covenant of good faith and fair dealing separate from an action on the underlying contract."  *Burton*, 373 F. Supp. 2d at 718; *Ulrich v. Federal Land Bank of St. Paul*, 192 Mich. App. 194, 197 (1991) ("Michigan does not recognize an independent tort action for an alleged breach of a contract's implied covenant of good faith and fair dealing."); *Belle Isle Grill Corp. v. Detroit*, 256 Mich. App. 463, 476  (2003) ("The trial court properly ruled that Michigan does not recognize a claim for beach of an implied covenant of good faith and fair dealing, and therefore properly dismissed this claim.").  Mich. Comp. Laws section 440.1203 provides: "Every contract or duty within this act imposes an obligation of good faith in its performance or enforcement."  The Comment to this section reads in part:

> This section does not support an independent cause of action for failure to
> perform or enforce in good faith.  Rather, this section means that a failure to
> perform or enforce, in good faith, a specific duty or obligation under the contract,

> constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power.  This distinction makes it clear that the doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached.

M.C.L. § 440.1203.  "Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the provision that such discretion be exercised honestly and in good faith."  *Burkhardt v. City Nat'l Bank of Detroit*, 57 Mich. App. 649, 652 (1975).

The Court grants Defendants Motion to Dismiss.  The implied covenant of good faith and fair dealing does not create an independent action.  Plaintiffs have already brought a claim for breach of contract – the covenant of good faith is an extension of that claim.  By claiming a breach of the covenant of good faith, Plaintiffs are really claiming that Defendants breached the contract when they contracted with product manufacturers in their own best interest, rather than in the best interests of the franchisees.

Plaintiffs argue that *Belle Isle* holds that the implied covenant of good faith is an independent cause of action when there is an abuse of discretionary obligation in an express contract.  In *Belle Isle*, the plaintiff entered into a lease agreement with defendants for a grill on Belle Isle.  256 Mich. App. at 466.  After the beginning of the lease, the Detroit Police Department issued an operations order which, at times, diverted the flow of traffic so that the grill was inaccessible.  *Id*. at 466-67.  Contrary to Plaintiffs contention, the *Belle Isle* court held only that "Michigan does not recognize a claim for breach of an implied covenant of good faith and fair dealing and therefore [the trial court] properly dismissed the claim."  *Id*. at 476.  Plaintiffs also cites *Burkhardt v. City National Bank of Detroit*, which held that when a party to a

29

matter has discretion in its performance, the law implies a condition that the discretion is exercised honestly and in good faith.  57 Mich. App. 649.  Additionally, Plaintiffs cite *Stephenson v. Allstate Ins.  Co.*, 328 F.3d 822 (6th Cir. 2003) to support its proposition.

In *Stephenson*, an insurance agent wanted to buy another agent's accounts.  The insurance agents worked eight miles apart from each other.  The parties drew up the necessary documents, but the insurance company denied their request because the two agents were not located in contiguous zip codes.  *Id*. at 824.  The plaintiff argued that the insurance company breached an implied covenant of good faith when it refused to approve the purchase of the accounts.  The plaintiff asserted that the company manual set forth requirements for obtaining approval, which modified the company's exclusive judgment and stated that sale approval could be given if the agents involved worked in close proximity, thus giving the company discretion to approve the sale.  *Id*. at 826.  The court held that when discretion is involved, the dependent party must rely on the good faith of the party in control and only in those cases do the courts raise the implied covenant of good faith and fair dealing.  *Id*.  However, the court found in favor of the defendant "because the transfer of accounts between agents rested exclusively with [the company], the contract presumed no discretion and . . . removed any basis upon which to imply a covenant of good faith and fair dealing."  *Id*. at 827.

The instant case is similar to *Stephenson*, where the transfer of accounts between agents rested exclusively with the company.  Here, like in *Stephenson*, there is no discretion in the contract.  The agreement states: "All . . . food products . . . used . . . must meet the specifications and must be purchased from an approved supplier."  (Defs.' Reply 4).  The decision regarding which food products are approved rests exclusively with Tubby's.  Tubby's, and only Tubby's, reserved the right to approve specifications and suppliers.

30

Even if the covenant of good faith and fair dealing did apply to the case at bar, Defendants never promised in the contract to get the lowest price for their franchisees. Franchisors are not only interested in the price of the products they buy, but also the quality of the product and the reliability of the manufacturer. These issues are certainly taken into consideration when trying to decide which product manufacturers are best for the franchise name and the franchisees. Additionally, a comparison between SDS's prices and competitors' prices has not been presented to the Court to rebut Defendants' argument. Without a comparison, the Court cannot judge whether the prices were excessive to the point of breaching the covenant of good faith and fair dealing.

Accordingly, the Court grants Defendants' Motion to Dismiss Count VI.

### 7.     Equitable Accounting (Count IX)

Defendants argue that Plaintiffs failed to pursue discovery on this issue. Defendants contend that Plaintiffs never requested to review Defendants ledger documents and during the depositions of Terry and Robert Paganes, Plaintiffs did not ask one question concerning the alleged misuse of advertising money. Defendants also claim that Plaintiffs brought three separate counts - breach of contract, common law fraud, breach of the duty of good faith and fair dealing - in the Original Complaint alleging the misuse of advertising funds. However, these claims were removed from the Amended Complaint.

Plaintiffs argue that it is impossible to obtain the information necessary to determine the extent of Defendants' misuse of advertising funds. Plaintiffs claim that Defendants refusal to provide required financial information to the Advertising Council, and Tubby's unilateral dissolution of the Advertising Council supports their contention that Tubby's and its shareholders have historically misused advertising funds. Plaintiffs assert that the only way to

31

determine how much Defendants stole is through forensic accounting.

Defendants are entitled summary judgment on Plaintiff's accounting claim. Michigan courts hold that an accounting in equity is unnecessary where discovery is sufficient to determine the amounts at issue. *Wilson v. Cont'l Dev. Co.*, 112 F. Supp. 2d 648, 663 (W.D. Mich. 1999). "As a general rule, a court may not invoke equity where there is an adequate remedy at law." *Eberhard v. Harper-Grace Hosps.*, 179 Mich. App. 24, 35 (1989); *Basinger v. Provident Life & Accident Ins. Co.*, 67 Mich. App. 1, 5 (1976). Here, it appears that Plaintiffs had a full opportunity to obtain discovery from Defendants relative to misspent money earmarked for advertising. Further, Plaintiffs have an adequate remedy at law. Plaintiffs could have brought a breach of contract, fraud or breach of fiduciary duty claim against Defendants. Indeed, Plaintiffs originally brought some of these claims in their Original Complaint. Additionally, although Plaintiffs state that an accounting may be necessary because it is "literally impossible to obtain the information necessary to determine the extent of Defendants' misuse of advertising funds," (Pls.' Resp. 17), Plaintiffs failed to explain why it is impossible to find this information through discovery. Therefore, the Court grants Defendants' Motion for Summary Judgment on Count IX.

### 8.      Release by Plaintiffs

Defendants argue that five plaintiffs released Tubby's from all claims by signing a Franchise Termination and Surrender Agreement ("Surrender Agreement") in connection with the sale of the franchise. Plaintiffs argue that if the Court finds that the five plaintiffs gave up their claims, they only gave up their claims as they applied to Tubby's. Plaintiffs claim that the release did not apply to the other Defendants in this litigation. Plaintiffs further assert that the five plaintiffs did not give up all of their claims against Tubby's, but only those claims known at

32

the time the Surrender Agreement was signed.  Plaintiffs believe that the word "claim" is

ambiguous in that it is unclear whether it means just known claims, and therefore extrinsic

evidence is admissible to ascertain the parties intent.

      The five plaintiffs who signed Surrender Agreements are Stores 91, 72, 25, 23, and 64.

(Barish Decl. 4).  The pertinent part of the Surrender Agreement states: "Seller and Franchisee

also releases Franchisor from any and all *claims*, judgments, and causes of action, rights or

demands of every kind or nature whatsoever."  (Barish Decl Ex. 15 ¶ 1) (emphasis added).  A

release can bar a claim.  *Cole v. Ladbroke Racing Mich., Inc.*, 241 Mich. App. 1, 13 (2000).

Michigan law states:

> The scope of a release is governed by the intent of the parties as it is expressed in
> the release.  If the text in the release is unambiguous, the parties' intentions must
> be ascertained from the plain, ordinary meaning of the language of the release.  A
> contract is ambiguous only if its language is reasonably susceptible to more than
> one interpretation. The fact that the parties dispute the meaning of a release does
> not . . establish an ambiguity.

*Ladbroke Racing*, 241 Mich. App. at 13-14.

      The Court agrees with Plaintiffs' argument that the Surrender Agreement only released

claims against Tubby's.  The signers of the Surrender Agreements were the Seller, the Purchaser

and Tubby's.  As the other Defendants were not party to the agreement, and as Plaintiffs did not

release the other Defendants in the Surrender Agreement, the release only applies to Tubby's.

The Court, however, does not agree that the word "claims" is ambiguous and that extrinsic

documents should be allowed to show the parties intent.  Plaintiffs incorrectly debates "claims."

Plaintiffs meant to argue that the word "all" is ambiguous as to whether it means all known

claims, or all claims of any kind, now and in the future.  "[T]here is no broader classification

than the word 'all.'"  *Ladbroke Racing*, 241 Mich. App. at 14.  The Court finds that the

Surrender Agreement is very clear that "all claims . . . of every kind or nature whatsoever" means all claims now and in the future.  The term "all," in this instance, is not ambiguous. Accordingly, the Court finds that the above mentioned Plaintiffs have released all claims against Tubby's, but may still bring claims against the remaining Defendants as applicable.

## III.   CONCLUSION

For the reasons stated, the Court:

(1)   DENIES Defendants' Motion for Summary Judgment on Count III for Stores 66 and 99 as to Tubby's, but GRANTS Defendants' motion as to the remaining Plaintiffs;

(2)   DENIES Defendants' Motion for Summary Judgment on Count VIII as to Tubby's, but GRANTS Defendants' motion as to the remaining Defendants;

(3)   DENIES Defendants' Motion to Dismiss on Count X;

(4)   DENIES Defendants' Motion for Summary Judgment as to Tubby's on Count IV, but grants the motion as to the remaining Defendants;

(5)   DENIES Defendants' Motion to Dismiss as to Tubby's and SDS on Count V, but grants the motion as to the remaining Defendants;

(6)   GRANT Defendants' Motion to Dismiss on Count VI;

(6)   GRANT Defendants' Motion to Dismiss on Count IX;

IT IS FURTHER ORDERED that the Court finds Stores 91, 72, 25, 23, and 64 have released all claims against Tubby's.

## Plaintiffs' Motion for Partial Summary Judgment as to Liability Pursuant to Count VI of Amended Complaint

## II.   ANALYSIS

Plaintiffs make the same argument in this motion as they did in their Response to Defendants' Motion for Summary Judgment.  Plaintiffs argue that Tubby's had discretion to choose and approve suppliers and therefore Tubby's was subject to the covenant of good faith

and fair dealing.  Plaintiffs' claim that Tubby's had the legal obligation to select manufacturers in good faith, negotiate prices in good faith, set prices to franchisees in good faith and pass on the cost savings negotiated by SDS.  Plaintiffs assert that Tubby's failed to do this, therefore Defendants breached the covenant of good faith and fair dealing.

Defendants respond that there is no independent action for breach of an implied good faith covenant in Michigan.  Defendants state that Plaintiffs cite no case law to support its assertion hat Tubby's must act in the best interests of franchisees.  Defendants claim that they did not breach a covenant of good faith because the quality of food was an important factor, those suppliers that gave "kickbacks" were only a few of Tubby's suppliers, and rebates in the food industry are common.  Further, Defendants argue that Plaintiffs have not established that prices are excessive.  Finally, Defendants argue that partial summary judgment on liability is not appropriate because the issue of liability is intertwined with the damages issue.

This issue was discussed in Defendants' Motion for Summary Judgment Count VI.  The Court granted summary judgment in favor of Defendants.  For the reasons stated in the Court's analysis of Count VI above, the Court denies Plaintiffs' partial motion for summary judgment on liability.

## III.   CONCLUSION

For the reasons stated, the Court DENIES Plaintiffs' Motion for Partial Summary Judgment.

## **Defendants' Second Motion for Summary Judgment on Count VI**

## II.   ANALYSIS

The Defendants again move for summary judgment again on Count VI of Plaintiffs' complaint.  Defendants seek to add arguments to Count VI of their original motion by

incorporating their Response to Plaintiffs' Motion for Summary Judgment into this motion,

thereby getting around the page limit requirement set for Defendants' first summary judgment

motion.  Regardless of Defendants' motives for filing a second motion for summary judgment on

Count VI, the motion is moot since the Court ruled above on Defendants' initial Motion for

Summary Judgment in favor of Defendants.  Accordingly, the Court denies Defendants' Second

Motion for Summary Judgment.

**III.**     **CONCLUSION**

For the reasons stated above, the Court DENIES Defendants' Second Motion for

Summary Judgment on Count VI.

Accordingly, the Court:

(1)     GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss,
         Motion for Summary Judgment, and Motion to Extend time;

(2)     DENIES Plaintiffs' Motion for Partial Summary Judgment as to Liability
         Pursuant to Count VI of the Amended Complaint; and

(3)     DENIES Defendants' Second Motion for Summary Judgment on Count VI.

**SO ORDERED**.

s/Paul D. Borman                                
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 27, 2006

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
September 27, 2006.

s/Denise Goodine                                
Case Manager